# KOENIG LAW GROUP, P.C.



December 18, 2021

Via Email to

Ms. Colleen Chipman
Senior Adjustor
Senior Adjuster, Marriott Claims Services

RE:  **My Client:**        **Patrick O'Haver**
     **Your Claim No.:**   **712886**
     **Date of Loss:**     **January 29, 2020**

### OFFER TO COMPROMISE PURSUANT TO O.C.G.A. §§ 24-3-37, 9-11-67.1, 33-4-7, and 51-12-14 AND *SOUTHERN GENERAL v. HOLT*, 200 GA. APP. 757 (1991) <u>FOR SETTLEMENT PURPOSES ONLY</u>

Dear Ms.Chipman:

Patrick O'Haver has retained us in regards to the personal injuries he suffered from an attack at the Westin Peachtree Plaza in downtown Atlanta, Georgia. The attack was caused by your overserving alcohol to an obviously drunk guest and your failure to provide adequate security leading to repeated violent attacks on my client.

<u>Marriott's Liability</u>

On the evening of January 29, 2020, Mr. O'Haver and some of his business associates were attending an industry event in the main lobby of the Westin. The lobby was rather crowded so he offered to get drinks for his group. One of your guests sitting at the bar, Brian Douglas Thompson, was noticeably drunk and slumped over when Mr. O'Haver approached the bar and ordered the drinks. Unprovoked, Mr. Thompson got agitated and, after Mr. O'Haver picked up his beers and headed back to his group, Mr. Thompson hit him in the chest with his fists. This caused Mr. O'Haver to spill beer all over his shirt and jacket. Mr. O'Haver reacted calmly and immediately alerted the bartender of the incident. Mr. Thompson then took several steps toward Mr. O'Haver and hit him in the chest again, this time much harder than the first time, and several chairs were knocked to the ground. Mr. O'Haver saw the bartenders call for security and four or five of your security personnel arrived on the scene.

Mr. O'Haver and his associates decided to leave to avoid any further issues. As they left the bar lobby area, Mr. O'Haver looked back and saw Mr. Thompson with your security personnel. He then stepped onto the granite floor area of the lobby. The next thing he recalls is being knocked off his feet, going vertical, hitting the floor with the entire right side of his body, landing on top of broken glass, and getting the wind knocked out of him. Instinctively, and still in shock from this attack, he got to his feet to try to avoid further harm. He asked one of his associates, Ken Le Faive, what had just happened. Mr. La Faive promptly got between my client and Mr. Thompson, the latter of whom had gone back to the bar area. Mr. O'Haver was bleeding and the glass he had been holding was broken. He felt like he'd just been hit by a freight train.[1]

Several guests approached Mr. O'Haver after the attack to ask if he was okay and to state that it should have never happened because security personnel had Mr. Thompson in their control. Other guests verbally confronted those personnel about their lapse. One woman was almost in tears, gave my client a hug and told him that what happened was scary to watch. Just when Mr. O'Haver thought it was all over, Mr. Thompson walked around your security personnel and lunged at him as he leaned against a large granite column. Mr. Thompson was shouting in words or substance and in a heavily slurred voice, "what the fu*k do I have to do now, apologize to you you fat fu*ker" and hit him again, hard, this time in the solar plexus.

At some point one of the guys who was with Mr. Thompson, who also was clearly drunk and talking in a manner as vulgar as Mr. Thompson was, started hitting Mr. Thompson before heading for the elevator and calling it a night.

After the attack Mr. Le Faive helped my client to some chairs. Mr. O'Haver began to feel the adrenaline wear off and the pain of his injuries begin to really kick in. The police arrived and interviewed Mr. O'Haver. The interviewing officer informed him that Mr. Thompson was obviously extremely drunk and had oversized pupils consistent with drug use. For his part, Mr. Thompson kept being loud and obnoxious, even when he was being held and questioned by the police. One of the officers left to review the security camera footage of the attack and, when he returned, Mr. Thompson was arrested. One of your staff followed Mr. O'Haver down the escalator to get him to agree to contact your General Manager for a meeting.

A witness, Mike Porter, who did not know my client before the attack, has provided a written statement of these events, corroborating all of the key details of the attack and your staff's incompetent, ineffective and, ultimately, grossly negligent response.[2] An excerpt of the statement of this clearly uninterested witness should be sufficient to give you an understanding of the outrageous nature of the entire incident:

> Hotel security did not do their job to keep the victim safe. The bully should have been cut off earlier as he was certainly overserved and made to leave the bar. It was a very uncomfortable situation. We were trying to pay our tab and leave when the victim and his colleagues passed by us, leaving the bar. When the victim was about

---

[1] You have the security camera footage of this attack.
[2] A copy of this statement is attached as Exhibit A.

25 feet away from the drunk, with his back turned, the drunk man ran at a full speed and pushed the victim in the back, sending him flying prone, into a granite column about 10 feet away. The impact of the push and the impact of the victim's collision into the column, were both extremely violent. The victim had a pint of beer that went flying into the air, smashing on the marble. This cowardly blindside attack was clearly intended to injure the man as he walked away. The hotel security staff was negligent. This act of violence was telegraphed, announced and should have been stopped.

We also provide you with the statements of Troels Svendsen, David Shields and Ken La Faive, three of my client's business associates, who also witnessed the attack.[3]

Mr. O'Haver asked your staff to hold on to Mr. Thomson and keep him away from him, and was told by one of them that you have a policy of zero contact unless someone's life was in eminent danger.

As requested, Mr. O'Haver met with your staff the next day. At that meeting your employee, Graham Denio, explained that the general manager could not see him, but that he had reviewed the video of the attack and that in the fourteen years he has worked at the Westin he never saw anything so vicious and unprovoked. He added that Mr. Thompson had left his room very early that day, that his room key had been locked out by security, that his luggage and personal belongings had been collected and moved from the room to the front lobby desk, that he would be immediately escorted off the premises upon his return, and that he was black-listed.[4]

Marriott failed to properly staff and secure the Westin by allowing a guest to become intoxicated and belligerent without taking the needed steps to remove him from the property before he viciously and repeatedly assaulted Mr. O'Haver in the hotel's public areas. In addition, the hotel's servers and security staff were not properly trained or supervised to protect Mr. O'Haver from this dangerous guest and his clearly and extremely vicious, violent and unprovoked intent, disposition and actions. Marriott had an affirmative obligation to protect Mr. O'Haver from these hazardous conditions and to keep him safe. The actions of your staff and supervisors did not meet these standards and Mr. O'Haver suffered extensive injury and pain accordingly.

In addition, under the facts and circumstances of this incident, there is no excuse for the failure to protect Mr. O'Haver from this eminently foreseeable and brutal attack, which gives rise to a presumption of a conscious indifference to the consequences he suffered.

---

[3] Copies of these statements received to date are attached as Exhibit B. Please note we are still gathering additional records and expense invoices.

[4] Mr. Thompson has since pled guilty and been sentenced for his crimes. *See State v. Thompson*, State Court of Fulton County, Georgia, Case/Accusation No. 20CR001048E. Exhibit C.

General and Special Damages[5]

Mr. O'Haver is continuing to receive treatment and currently anticipates that his medical and rehabilitation expenses will well exceed $100,000.00.

After the attack Mr. O'Haver experienced pain in his knee, hip, ribs, shoulder and neck, and he was unable to perform his job. The morning after the attack he was driven to the emergency room at Emory Hospital where doctors put him on pain medication, a knee brace and a set of crutches.

The charges for these services total $1,911.00.[6]

After he returned home Mr. O'Haver met with his doctor. On or about January 31, 2020, Mr. O'Haver visited Johns Creek Primary Care, where his doctor put him on Naproxen, 500 milligrams twice a day and Cyclobenzaprine NC1, 10 milligrams daily, with a follow-up examination in two weeks.

The charges for these services total $550.00.[7]

Since the assault Mr. O'Haver has been in physical therapy for his injuries. After receiving two painful rounds of cortisone, scans and X-rays, and some physical therapy, beginning on or about February 11, 2020 Mr. O'Haver again visited his doctor, who referred him for orthopedic surgery for his right shoulder pain and injury. He also learned that the recovery from this surgery would be difficult and it would take months to assess its outcome.

The charges for these services, related medical treatment and an MRI total $4,107.00, $4,838.46, $3,633.55 and $2,946.00.[8]

Mr. O'Haver had to delay the surgery due to a surge in the COVID-19 pandemic in early 2020. Emory Hospital needed the beds to treat patients suffering from that disease and Mr. O'Haver could not risk a hospital stay because he has Chronic Lymphocytic Leukemia, which affects his immune system.

On or about August 29, 2021 Mr. O'Haver underwent a successful surgery to reattach his bicep.

The charges for these services including the hospital, anesthesiology and the Resurgens' physician total $57,546.15.[9]

---

[5] Copies of Mr. O'Haver's medical expenses attached as Exhibit D.
[6] *See* Exhibit D.
[7] *See* Exhibit D.
[8] *See* Exhibit D.
[9] *See* Exhibit D.

4

Unfortunately, he suffered an injury to his jaw during intubation for the surgery and was required to undergo an alveolectomy. An alveolectomy is an invasive surgical dental procedure that helps to remove some or all of the alveolar bone that encapsulates a tooth and to recreate the surface and shape of the jawbone. This surgery took place on September 10, 2021.

The charges for a dental appointment and the oral surgery total $119.00 and $1,350.00, respectively.[10]

The following is a summary of medical bills to date relating to the injuries Mr. O'Haver sustained in the incident as described above:

| Provider | Amount Billed |
| --- | --- |
| Emory Hospital<br>- Midtown - $1,911.00<br>- Johns Creek - $3,633.55 | $5,544.55 |
| Johns Creek Primary Care | $550.00 |
| PT Resurgens | $4,107.00 |
| MD – Resurgens | $4,838.46 |
| MRI – Imaging | $2,946.00 |
| MD – Surgery | $57,546.15 |
| Dentist | $119.00 |
| Oral Surgeon | $1,350.00 |
| **TOTAL** | **$77,001.16** |

Mr. O'Haver will require substantial continuing care and we presently estimate that these costs will reach into the tens of thousands of dollars.

Mr. O'Haver holds B.A. in Business Administration from West Virginia University. At the time of the injury, he was a director of strategic accounts for Haarslev, Inc., a supplier of rendering and processing solutions in the fish, poultry and meat industry, earning $40.87 per hour plus commissions. Due to his injuries he was out of work for four weeks in February 2020. Lost salary for this period totals $6,538.88. He subsequently has been employed by Innovatec Hatchery Automation, earning $48.08 per hour plus a 3% commission on sales and bonuses of $25,000, $50,000 and $75,000 based on his performance. Due to his injuries, surgery and recovery he was out of work for one week plus an additional 32 days from August 18 to October 11, 2021. Lost salary for this period total $14,341.20. Mr. O'Haver also has lost opportunities for commissions and bonuses worth a significant amount.

Unfortunately, Mr. O'Haver also has experienced bouts of stiffness and pain and has not been able to recover a full range of motion in his shoulder. He continues to go to physical therapy twice a week as instructed by his doctor. Even so, his present range of motion has been drastically limited and is still significantly impaired as little as 48% of his pre-injury abilities.

---

[10] *See* Exhibit D.

Mr. O'Haver's life also has changed significantly in other ways since the attack. First and foremost, every day he has experienced distress, worry, fear and anxiety that arose out of his injuries and his slow recovery. He also experiences pain and suffering from his bouts of recurring pain as well as distress, worry, fear and anxiety at the prospect of their unpredictable return and the lack of range of motion he has been unable to recover, and may never recover, since the attack.

At the time of the injury Mr. O'Haver was an active golfer, youth sports enthusiast, family man and home owner. Mr. O'Haver loves to stay active with his business associates on the golf course and even more so doing fun activities with his children, often on the spur of the moment, like throwing a football around out in the yard, but his injuries have prevented him from doing any of this. He also has been unable to do any yardwork, exercise, renovations at his home or social activities involving his upper body since the day of the attack.

### Settlement

This settlement demand is being made pursuant to O.C.G.A. §§ 51-12-14, 9-11-67.1, and *Southern General v. Holt,* 200 Ga. App. 757 (1991).

In an effort to allow all parties involved to avoid the expenses of litigating this matter, demand is hereby made for Mr. O'Haver's claim for unliquidated damages arising out of the above-referenced negligence for the sum of $1,000,000.00. If this demand is met by **January 17, 2022**, Mr. O'Haver is willing to provide a full release to Marriott and its insurer for any claims and/or causes of action he has arising out of the above-referenced attack. Should you refuse our demand, we anticipate that the damages we will obtain through litigation will be far in excess of this amount.

Georgia Code section 51-12-14 provides that if this demand is not met within thirty (30) days from the date you receive this notice, and if my client recovers the amount of our demand as set forth herein at trial, you will be liable for pre-judgment interest on the amount of the judgment from the date beginning thirty days from the date of this notice.

I look forward to hearing from you.

Regards,

George A. Koenig

Enclosures

cc:     Patrick O'Haver (via Email)